## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **DOMINICK A. FEELEY,** | Civ. No. 14-4970 (KM) |
| **Plaintiff,** | |
| **v.** | **OPINION** |
| **COMMISSIONER OF SOCIAL SECURITY,** | |
| **Defendant.** | |

Dominick Feeley's application for Social Security disability benefits was denied by the Administration. Feeley has appealed to this Court. He argues that the ALJ did not properly consider his obesity and also did not consider the combined effects of all of Feeley's impairments. He adds that the ALJ erred in rejecting the opinion of Feeley's treating physician without sufficient cause. Feeley argues that the ALJ erred in assessing Feeley's residual functional capacity. Finally, he contends that the ALJ relied on an outdated publication when he determined that there were a significant number of jobs in the national economy that Feeley could perform. I find, however, that the ALJ properly applied the governing legal standards and that his decision was supported by substantial evidence. I will therefore affirm ALJ Kilgannon's decision.

## Background

Dominick Feeley suffers from several medical conditions. He has various heart problems including coronary artery disease, hypertension, and obesity. (Decision,[1] 3-4) He also suffers from diabetes and from mental health issues

---

[1] Citations to the record will be abbreviated as follows:

including an adjustment disorder and anxiety. (Decision, 3-4) In addition, Feeley reports experiencing several additional symptoms including blurry vision, sleep apnea, left hand numbness, and bilateral knee and back pain. (Hearing, 20-22; Decision, 4)

Before applying for disability benefits, Feeley worked as a data entry clerk, a hospital admitting clerk, and a general clerk. (Decision, 10). Feeley applied for benefits in October of 2011, claiming disability beginning as of January 4, 2011. (Decision, 1). On March 28, 2013, an Administrative Law Judge, Patrick Kilgannon, affirmed the determination that Feeley was not disabled during the relevant period. (Decision, 12). That denial proceeded through the administrative appeal process and was affirmed, rendering it a final decision.

**ALJ's Decision**

To determine whether Feeley met the criteria to be considered disabled, the ALJ followed the familiar five-step process outlined at 20 C.F.R. 404.1520(a). Under that framework, an ALJ first asks whether the claimant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). At Step 2, an ALJ asks whether the claimant has a medically determinable

---

"Decision" – Social Security Administration Office of Disability Adjudication and Review Decision, Dkt. No. 6-2, pp. 13-31.

"Feeley Brief" – Brief in Support of Plaintiff Dominick A. Feeley, Dkt. No. 9.

"Figurelli Evaluation" – Psychological Evaluation performed by Jennifer C. Figurelli, Ph.D., Dkt. No. 6-7, Exh. 4F, 330-334.

"Function Report" – Function Report – Adult, Dkt. No. 6-6, Exh. 5E, 187 – 195.

"Gantz Letter" – Medical Records of Kenneth Gantz, MD, Dkt. No. 6-9, Exh. 9F, 481-521.

Hearing Tr. – Transcript of Oral Hearing before ALJ Patrick Kilgannon, Dkt. No. 6-2, 32-66.

"Hoffman Evaluation" – Hudson County Medical Determination, Report of Alexander Hoffman, MD, Dkt. No. 6-7, Exh. 3F, 324-329.

"Smith Assessment" – Physical Residual Functional Capacity Questionnaire, completed by Dr. John J. Smith, Dkt. No. 6-8, Exh. 6F, 339-415.

impairment, or a combination of impairments, that is "severe." 20 C.F.R.
§ 404.1520(c). At Step 3, the ALJ asks whether the claimant's impairments are
so severe as to meet or medically equal the criteria for an impairment listed in
20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(d). The ALJ
will then assess the claimant's residual functional capacity ("RFC"). 20 C.F.R.
§ 404.1520(e). In layman's terms, this means that the ALJ will determine what
is the most the claimant can do despite the limitations that have been
established. 20 C.F.R. § 404.1545(a)(1). At Step 4, the ALJ determines whether,
given that RFC, the claimant can still perform past relevant work. 20 C.F.R.
§ 404.1520(a)(4)(iv). Finally, at Step 5 the ALJ will determine whether the
claimant can perform another kind of work that exists in the national economy.
20 C.F.R. § 404.1520 (a)(4)(v).

       In this case, the ALJ determined at Step 1 that Feeley had not engaged in
substantial gainful activity since the alleged disability onset date. (Decision, 3)
The ALJ noted that, after applying for disability benefits, Feeley briefly
attempted to work as a delivery driver at a restaurant, and then behind the
counter, but was unable to keep up. (Hearing Tr., 6; Decision, 3) Feeley was
forced to leave that position after only two weeks. The ALJ's determination was
proper; the regulations explain that any work activity that ends within three
months because to an impairment should be considered an unsuccessful work
attempt, and should not be considered substantial gainful activity. (Decision, 3
citing 20 C.F.R. § 404.1574)

       At Step 2, the ALJ determined that Feeley had six severe impairments:
coronary artery disease (in a post-bypass status); hypertension;
hyperlipidemia; obesity; diabetes; and adjustment disorder. (Decision, 3) The
ALJ did not, however, find any severe impairments associated with various
other maladies of which Feeley complained. (Decision, 4) These included blurry
vision, sleep apnea, left hand numbness, and bilateral knee and back pain.
(Decision, 4) These symptoms, wrote the ALJ, were not supported by "medical
signs and/or laboratory findings demonstrating the existence of a medically

determinable physical impairment." (Decision, 4) Accordingly, the ALJ found they could not form the basis for a finding of disability. (Decision, 4)

At Step 3, the ALJ considered whether Feeley's impairments, alone or in combination, met or medically equaled the severity of one of the listed impairments in Appendix 1 to 20 C.F.R. Part 404, Subpart P. The ALJ found that none of the impairments individually or collectively met the required level of severity. (Decision, 4-6)

The ALJ then determined Feeley's residual functional capacity. Feeley, the ALJ found, retained the capacity to perform "a range of sedentary work." (Decision, 6) Although Feeley could not "climb ladders, ropes, or scaffold," he could occasionally "climb ramps or stairs, balance, kneel, crouch, crawl, and stoop." (Decision, 6) The ALJ found that any work to be done by Feeley would have to be "limited to unskilled work in a low stress job," *i.e.,* one "having only occasional decision-making required and only occasional changes in the work setting." (Decision, 6)

At Step 4, the ALJ considered whether, given this RFC, Feeley could return to his prior work as a clerk. To help answer this question, the ALJ consulted a vocational expert named Louis Szollosy. (Decision, 10) Szollsy testified that work as a clerk is semi-skilled, and that it may be performed at a sedentary level, but is typically performed at a "light exertional" level. Based on Feeley's description, the vocational expert said that Feeley had in fact performed his prior work at light exertional level. (Decision, 10) The ALJ concluded that Feeley was not capable of returning to his prior job, either as he performed it or as it is generally performed. (Decision, 10)

Finally, at Step 5, the ALJ considered whether there are jobs available in the national economy that Feeley could perform. At this step, the ALJ was again assisted by the vocational expert. The ALJ concluded, based on the vocational expert's testimony, that Feeley could perform work as a call out operator, a charge account clerk, or a telephone quotation clerk. In each of those positions, the ALJ found, a sufficient number of jobs exist in the national economy for Feeley to find work. (Decision, 11)

## Discussion

Feeley raises four principal objections to the ALJ's decision. First, he challenges the ALJ's decision at Step 3 that Feeley's impairments do not meet or equal one of the impairments listed in Appendix 1. Second, Feeley argues that the ALJ erred in rejecting the opinion of Feeley's treating physician. Third, Feeley argues that the ALJ erred in assessing his residual functional capacity. Finally, Feeley argues that the Commissioner was wrong to conclude that there are jobs in the national economy that Feeley could perform. (Feeley Brief, 12-16) I have respectfully considered these contentions, but I disagree with them.

## I.      Standard of review

This Court has jurisdiction pursuant to 42 U.S.C § 405(g). Under that statute, a district court's review is limited to deciding whether the ALJ's decision was supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (internal quotation marks and citation omitted). It is "less than a preponderance of the evidence but more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995). If the ALJ's decision is supported by substantial evidence and is free from legal error, I must affirm that decision, even if I might have decided the case differently. *Monsour Medical Ctr. v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986).

## II.     Step 3 Determination

Feeley's objection to the ALJ's evaluation of his impairments at Step 3 has three components. First, Feeley argues that the ALJ did not properly consider Feeley's obesity as an impairment on its own, nor did he consider how

obesity might be exacerbating other impairments. (Feeley Brief, 20) Second, Feeley argues that although the ALJ considered Feeley's impairments separately, he did not properly consider whether those impairments, in combination, were equivalent in severity to one of the listed impairments. (Feeley Brief, 16-24) Third, Feeley argues that the ALJ improperly rejected the opinion of Feeley's treating physician, which was entitled to deference. (Feeley Brief, 11, 23)

I find that the ALJ properly applied the regulations and that his conclusion was supported by substantial evidence. The ALJ considered whether the plaintiff's impairments met or equaled the criteria provided in Appendix 1 for three categories of impairments: endocrine disorders, cardiovascular disorders, and mental disorders. The symptoms and afflictions that the ALJ considered in his discussion of each category were not limited to any one impairment. For example, the symptoms that the ALJ considered in discussing the claimant's cardiovascular disorders included symptoms attributable to the claimant's obesity such as mobility restrictions and swelling of the legs. Likewise, the ALJ's discussion of Feeley's mental capacity included an assessment of areas that would be affected by Feeley's obesity, including limitations on the activities of daily living and feelings of depression. In general, the ALJ's opinion embodies a holistic approach to Feeley's impairments at Step 3.

### a. Cardiovascular impairment

The ALJ properly treated the claimed impairments of the cardiovascular system. Feeley's medical records do not reflect diagnosable heart conditions of sufficient severity to meet the listings in section 4.00. As of January 2012 Feeley's heartbeat showed a "regular rate and rhythm" (Hoffman Evaluation, 2) His heart tones were "a little distant" but there was no evidence of arrhythmia. (Hoffman Evaluation, 2) There was only a "very fain ejection murmur." (Hoffman Evaluation, 2) A "stress rest myocardial perfusion scan" revealed "no definitive evidence of fixed or eversible defect, a top normal to enlarged left

ventricle, and an ejection fraction of 47%." (Decision, 7) There was no evidence of significant arterial narrowing. (Decision, 4)

Likewise, the record indicates that the symptoms that Feeley suffers from these heart problems are not sufficiently severe to meet the Appendix 1 criteria. Feeley reported no negative side effects from his medications. (Decision, 9) He walks with a "normal gait" and without the use of an assistive device. (Hoffman Evaluation, 2) He had no difficulty getting on and off an examination table in the doctor's office. (Hoffman Evaluation, 2) As of January 2012, he was not wheezing. (Hoffman Evaluation, 2) Feeley does report occasional swelling of his legs, for which his doctor recommended a water pill which Feeley does not take. (Hoffman Evaluation, 1; Hearing Tr., 10, 20) Overall, the record did not reflect any significant or severe cardiac symptoms, and Feeley has pointed to none. (Decision, 4)

Feeley's own statements about his cardiovascular health are consistent with the ALJ's conclusions. In August of 2010 (*i.e.*, prior to the alleged disability onset date) Feeley reported that "from a cardiac standpoint he fe[lt] well," and he denied "effort-related chest pain, shortness of breath, palpitations, or exertional dyspnea." (Gatz Records, 3; Decision, 7) As of January 2012 (approximately one year after the alleged disability onset date) Feeley reported experiencing no chest pain. (Hoffman Evaluation, 1) He was able to walk a number of blocks at a time. He could climb three flights of stairs (he lived in a third-floor walk-up), sometimes without stopping. (Hoffman Evaluation, 1) By February of 2013, at his hearing before the ALJ, Feeley testified that his symptoms were "somewhat" controlled. (Hearing Tr., 16; Decision, 6) The only symptoms he reported were shortness of breath, difficulty lifting objects over five pounds, and swelling of the legs. (Hearing Tr., 16) As the ALJ found, Feeley has not reported "any significant cardiac symptoms such as chest pain or syncope during his many follow-up appointments with his primary care physician." (Decision, 9)

The evidence also supported a conclusion that Feeley's heart condition was not severely restricting his daily living activities. (Decision, 4) Feeley

7

reported that he is able to bathe, dress, and have breakfast on his own. (Hearing Tr., 17; Decision, 4) He attempts to "do little things around the house," and runs errands and pays bills "as needed." (Hearing Tr., 17-18; Decision, 4) Every week he goes to church and goes shopping with his wife. He took a bus to his appointment with Dr. Hoffman, and he is able to drive. (Hoffman Evaluation, 1)

### b. Mental impairment

The ALJ also considered Feeley's mental impairment, identified as adjustment disorder. The ALJ accepted the evidence that Feeley does suffer from an adjustment disorder. He cries about three to four times per week, and "becomes depressed" two to three times a week. (Figurelli Evaluation, 3) He takes Xanax three times per day for anxiety. (Hearing Tr., 17, 15; Decision, 6) Feeley reported one instance in which he "though about not wanting to live." (Figurelli Evaluation, 3) Feeley also reports losing his temper on a regular basis. (Figurelli Evaluation, 2-3) While I do not doubt that Feeley's psychological impairment is a serious challenge for him, there is substantial evidence to support the ALJ's conclusion that this impairment does not rise to the level of severity required to meet the Appendix 1 criteria.

Appendix 1 contains three lists of criteria for severity relating to mental disorders, contained in section 12.04, paragraphs A, B, and C. To satisfy step 3, the claimant must meet either: (1) the requirements of Paragraph A *and* the requirements of Paragraph B; *or* (2) the requirements of Paragraph C. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04.

As to the first alternative, the ALJ bypassed Paragraph A and focused on Paragraph B (both are required). Paragraph B requires that the claimant's impairment include at least two of the following four conditions:

      1. Marked restriction of activities of daily living; or

      2. Marked difficulties in maintaining social functioning; or

   3. Marked difficulties in maintaining concentration,
      persistence, or pace; or

   4. Repeated episodes of decompensation, each of
      extended duration;

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. The ALJ found that Mr. Feeley

had only mild difficulties in activities of daily living and social functioning.

(Decision, 5) The ALJ further found that Feeley had only moderate difficulties

in concentration, and noted no instances of decompensation. (Decision, 5)

   As to the second alternative, Paragraph C requires any of three

symptoms: 1) repeated episodes of decompensation; 2) a residual disease

process resulting in such marginal adjustment that even a minimal increase in

mental demands or change in environment would cause the individual to

decompensate; or 3) A history of one or more years' inability to function outside

of a highly supportive living arrangement, with an indication of continued need

for such an arrangement. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. The ALJ

noted that none of those conditions were present.

   The ALJ's conclusions were supported by substantial evidence. With

respect to the Paragraph B criteria, Feeley does not experience marked

restriction in activities of daily living, nor in social functioning. Feeley reported

that he is able to bathe, dress, and have breakfast on his own. (Hearing Tr., 17;

Decision, 4) He runs errands and pays bills "as needed." (Hearing Tr., 17-18;

Decision, 4) He is able to prepare sandwiches, snack foods, and microwaveable

meals on a daily basis. (Function Report, 3) He feeds his dog. (Function Report,

1) He does light housework such as "light laundry," dusting, and vacuuming.

(Function Report, 3) He is able to drive and to use public transportation.

(Function Report, 4) He is able to watch television and play on the computer

"fairly well." (Function Report, 4-5) Every week he goes to church and goes

shopping with his wife (they have their groceries delivered rather than carry

them home). (Hearing Tr., 17; Decision, 4) He stated that 4-5 times per week he

meets with friends, talks on the phone, or emails. (Function Report, 5;

Decision, 5) He stated that he gets along with authority figures "fairly well."

(Function Report, 7) All of this constitutes substantial evidence in support of

the ALJ's conclusion that Feeley's activities of daily living and social functioning are not so impaired as to meet the Paragraph B criteria.

There is also substantial evidence that Feeley's concentration, persistence, and pace are impaired, but only moderately so. Feeley does report some problems with concentration and persistence. He says that he does not finish what he starts (for instance, conversations, chores, or reading). (Function Report, 6; Figurelli Evaluation, 6; Decision, 5) He becomes distracted easily, loses things, and needs to be reminded about appointments and to take his medication. (Figurelli Evaluation, 6; Decision, 5) Nonetheless, Feeley has other abilities that ameliorate those difficulties. Feeley reports that he can pay attention for about 30 minutes at a time. (Function Report, 6; Decision, 5) He can follow instructions, both written and oral, "quite well." (Function Report, 6) He was able to recall a list of four words after five minutes, could perform basic math, and could spell a simple word forward and backward. (Figurelli Evaluation, 3)

Finally, Feeley reports no episodes of decompensation. (Decision, 5)

The ALJ's determination that Feeley met neither the Paragraph B nor the Paragraph C criteria was therefore supported by substantial evidence.

### c. Endocrine Disorder

The ALJ also considered Impairment 9.00, Endocrine Disorders. Subpart 5 of this listing explains that the impairments resulting from endocrine disorders like diabetes are evaluated under the listings for the other body systems that are affected. 20 C.F.R. Part 404 Subpart P, Appx. 1 § 9.00(B). For instance, diabetes can lead to complications from hyperglycemia, including gangrene, coronary artery disease, infection, and cognitive impairments. *See* 20 C.F.R. Part 404 Subpart P, Appx. 1 § 9.00(B)(5)(a).

Feeley's medical records show no evidence that his diabetes had an impact on another body system serious enough to meet one of the listings. (Decision, 4). Feeley's diabetes is treated with medication, from which Feeley reported no negative side effects. (Decision, 6, 9). Dr. Hoffman, the consultative

physician, indicated that Feeley's diabetes "was fairly well-controlled."
(Decision, 7). Thus, the ALJ's conclusions that Feeley's impairments do not
meet the severity required by section 9.00 was supported by substantial
evidence.

### d. Feeley's arguments of procedural error at Step 3

For the reasons expressed above, the ALJ's Step 3 determination had
ample record support. Feeley argues that it was nevertheless infected by
procedural error. The matter must be remanded, he says, because the ALJ
failed to sufficiently consider Feeley's obesity individually and in combination
with other impairments; generally failed to consider the combined effect of all of
his impairments; and failed to give due weight to the opinion of his treating
physician. I disagree.

### (i)    Obesity and combination of conditions

The Social Security Administration has explained how ALJs should
consider a claimant's obesity in Social Security Ruling 02-1P. Because obesity
is not an impairment listed in Appendix 1 (SSR 02-1P, 2002 WL 34686281 at
*4), the ALJ at Step 3 should consider whether the claimant's obesity is
equivalent to one of the listed impairments. The ALJ is directed to consider
obesity in isolation, and also in combination with other impairments.

As for considering obesity alone, the regulations explain:

> We may also find that obesity, by itself, is medically equivalent to a listed
> impairment...For example, if the obesity is of such a level that it results
> in an inability to ambulate effectively, as defined in sections 1.00B2b or
> 101.00B2b of the listings, it may substitute for the major dysfunction of
> a joint(s) due to any cause (and its associated criteria), with the
> involvement of one major peripheral weight-bearing joint in listings 1.02A
> or 101.02A, and we will then make a finding of medical equivalence.

SSR 02-1P 2002 WL 34686281, *5 (Sept. 12, 2002)

As for considering obesity in combination with other impairments, the
regulations explain that other conditions may be exacerbated by obesity, and
must be considered in combination with it:

11

> We will...find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing. For example, obesity may increase the severity of coexisting or related impairments to the extent that the combination impairments meet the requirements of a listing. This is especially true of musculoskeletal, respiratory, and cardiovascular impairments. It may also be true for other coexisting or related impairments, including mental disorders.

SSR 02-1P 2002 WL 34686281, *5 (Sept. 12, 2002). Indeed, the ALJ must consider whether obesity, in combination with *un*related impairments, is equivalent in severity to a listed impairment:

> We will also find equivalence if an individual has multiple impairments, including obesity, no one of which meets or equals the requirements of a listing, but the combination of impairments is equivalent in severity to a listed impairment.

*Id.*

All of these are alternative routes to the same goal. In all cases, the question is whether the claimant's impairments, alone or together, are severe enough to be equivalent to one of the impairments listed in Appendix 1.

Here, the ALJ reviewed Feeley's symptoms and conditions (including his obesity) in detail. (*See* Part II.a - II.c, *supra*). He then concluded that Feeley's restrictions did not rise to a level that met or equaled any of the impairments listed in Appendix 1. In doing so, the ALJ explicitly acknowledged that he was considering Feeley's impairments both alone and in combination as required by Ruling 02-1p:

> The claimant does not have an impairment *or combination of impairments* that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1...while there is no specific listing for obesity, this impairment was considered in conjunction with the claimant's other impairments as instructed by Social Security Ruling 02-1p. In this case, there is no evidence that the claimant's obesity has exacerbated his other conditions; for example, it has not impaired his ability to ambulate effectively.

(Decision, 4)

As I found at Part II.a - II.c, *supra*, the record contains substantial evidence to support that conclusion. Here, I also find that the ALJ's methodology was consistent with what the Third Circuit requires, and was not infected by procedural error:

> We also conclude that the ALJ's step three analysis was sufficient to permit judicial review. After broadly concluding that [the claimant] has no impairment, which meets the criteria of any of the listed impairments, the ALJ followed this conclusion with a searching review of the medical evidence. Under our precedents, this is sufficient. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (finding step three analysis adequate where ALJ reviewed medical evidence and concluded, "after carefully compar[ing] the claimant's signs, symptoms, and laboratory findings with the criteria specified in all of the Listings of Impairments, the claimant's impairments do not meet or equal the criteria established for an impairment shown in the Listings.")

*Klangwald v. Comm'r of Soc. Sec.*, 269 F. App'x 202, 204 (3d Cir. 2008). Here, too, the ALJ conducted a searching review of the medical evidence. He explicitly acknowledged his obligation to consider all impairments, including obesity, alone and also in combination. He stated that he had done so, and made findings amply supported by the record. That discharged the ALJ's duty to consider obesity and the other impairments, alone and in combination.

I find no cause for remand on this basis.

### (ii)    Treating Physician

Feeley also objects that the ALJ improperly rejected the opinion of Feeley's treating physician, Dr. Smith. (Feeley Brief, 11) Dr. Smith filed a "Physical Residual Functional Capacity Questionnaire" opining that Feeley could not sit for more than 45 minutes at one time or for more than two hours in the course of a workday. (Smith Assessment, 3-4; Feeley Brief, 24) Dr. Smith also concluded that Feeley's conditions would likely cause him to be absent from work for an average of more than four times per month. (Smith

13

Assessment, 5; Feeley Brief, 24) And he stated that Feeley would need to elevate his legs above his hips 60%-80% of the time. (Smith Assessment, 4)

Deciding whether a claimant is disabled is the purview of the Commissioner alone. A claimant is not entitled to benefits simply because a physician, even a treating physician, proffers the legal conclusion that the claimant is disabled. *See* 20 C.F.R. § 416.927(d)(1) ("We [*i.e.*, the Social Security Administration] are responsible for making the determination or decision about whether you meet the statutory definition of disability...A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled."); *Gantt v. Comm'r Soc. Sec.*, 205 F. App'x 65, 66-67 (3d Cir. 2006).

The ALJ must, however, give the evidence respectful consideration and state his or her reasons for accepting and rejecting it, particularly in the case of the opinion of a treating physician. In general, the opinion of a medical professional who has actually treated the patient is entitled to deference. (20 C.F.R. § 416.927(c)(2)) ("Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s))." But the opinion of a treating source must be given "controlling weight" only when that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 416.927(c)(2).

Thus the ALJ may reject a treating physician's opinion if it is contradicted by the doctor's own records or other credible medical evidence in the record. Here is an example of such a rejection, upheld by the Court of Appeals:

> Here, the ALJ rejected Dr. Gansheroff's opinion of marked limitation because it contradicted his own treatment records, which indicated Becker's mental limitations as only moderate. Likewise, the ALJ rejected Dr. Smith's interrogatory responses and conclusions regarding Becker's ability to work because they

14

> contradicted his own treatment records, which indicated that
> Becker had responded positively to medication and treatment and
> could sit, stand, walk, and lift to some degree. Dr. Smith's
> interrogatory responses were also contradicted by Dr. Gouda, Dr.
> Aguire, and even Becker herself, all of whom either documented or
> testified that Becker was able to ambulate and perform various
> light activities for periods of time without severe pain. Thus, the
> ALJ could properly reject parts of the opinions of Dr. Smith and
> Dr. Gansheroff.

*Becker v. Comm'r of Soc. Admin.*, 403 F. App'x 679, 686 (3d Cir. 2010). *See also Morris v. Barnhart*, 78 F. App'x 820, 824 (3d Cir. 2003) (upholding an ALJ's rejection of a treating psychiatrist's opinion where that opinion was inconsistent with the other medical evidence in the record).

The ALJ hearing Feeley's case found that the opinions of a treating physician, Dr. Smith, were not supported by the other medical evidence. For example, Dr. Smith's own treatment notes do not record significant cardiac symptoms beyond shortness of breath and some difficulty lifting. (Decision, 6) Likewise, although Dr. Smith opined that Feeley should keep his legs elevated above his hips 60-80% of the time, no such diagnosis is indicated in Smith's treatment records (which span at least four years).

In addition, the ALJ was entitled to discount Dr. Smith's opinion based on the quality of the explanation he provided. "[A] treating physician's opinion ... may [also] be accorded less weight depending upon the extent to which a supporting explanation is provided for the opinion." *Cunningham v. Comm'r of Soc. Sec.*, 507 F. App'x 111, 118-19 (3d Cir. 2012). Here, Smith filled out a SSA form, but provided little explanation for his conclusions. (*See* Dkt. No. 6-8, Exh. 6F, 1-6)

In sum, I find that the ALJ's decision to reject Dr. Smith's opinion was supported by substantial evidence and was not procedurally suspect. The ALJ did not err in rejecting Dr. Smith's opinion, and a remand is not required on these grounds.

### III.   **RFC Assessment**

Feeley also argues that the ALJ erred in assessing Feeley's residual functional capacity. I disagree.

The ALJ concluded that Feeley could perform sedentary, unskilled work in a low-stress job. The evidence reviewed above amply supports that conclusion. Treatment records indicated that Feeley had good upper body grip strength and could drive, take public transportation, walk normally, and get on and off an examination table without assistance. (Hoffman Evaluation, 1-2) Records of Feeley's mental condition are not inconsistent with the ability to operate proficiently in a low-stress environment. Feeley has pointed to nothing in the record (other than Dr. Smith's opinion, which the ALJ rejected for sufficient reasons) indicating that this assessment was not supported by substantial evidence.

### IV.   **Step 5 Determination**

Feeley also challenges the ALJ's determinations at Step 5 that he was capable of performing work that is available in the national economy. This conclusion, too, was supported by substantial evidence and untainted by procedural error, and I will uphold it.

The ALJ relied on the testimony of a vocational expert to conclude that Feeley could perform three categories of jobs existing in significant numbers in the national economy: a telephone quotation clerk, a call out operator, and a charge account clerk (Decision, 11) Each of these is taken from the Department of Labor's Dictionary of Occupational Titles ("DOT"). (Decision, 11)

Feeley objects that these job categories are outdated. (Feeley Brief, 12-16) These job categories, Feeley argues (albeit without citation), were last updated in 1977. (Feeley Brief, 31-15) (I note, however, that the DOT itself was updated in 1991.) Dates aside, Feeley argues that a simple reading of these job descriptions compels the conclusion that they are out of date. (Feeley Brief, 12-16)

As to one of these three job categories, Feeley has a point. The vocational expert cited DOT No. 237.367-046, "Telephone Quotation Clerk." The DOT describes that job as follows:

> Answers telephone calls from customers requesting current stock quotations and provides information posted on electronic quote board. Relays calls to REGISTERED REPRESENTATIVE (financial) 250.257-018 as requested by customer. May call customers to inform them of stock quotations.

DICTIONARY OF OCCUPATIONAL TITLES, § 237.367-046, 1991 WL 672194.

The notion of an investor calling his brokerage house on the telephone to have a stock quotation read to him by a receptionist who monitors an "electronic quote board" does seem rather quaint. I am sure that it still occurs. Nevertheless, the Vocational Expert's testimony that in 2012 there were approximately 970,000 telephone quotation clerk jobs available nationally, and 95,000 available regionally, seems dubious. (Hearing Tr., 31)

The Department of Labor itself now uses a more recent incarnation of the Dictionary of Occupational Titles called O*Net.[2] O*Net has abandoned the "Telephone Quotation Clerk" job category. O*Net job categories, however, contain cross-references correlating them to the categories in the DOT.[3] I have examined them in an effort to see whether "Telephone Quotation Clerk"

---

[2]     O*Net seems to have replaced the Dictionary of Occupational Titles. The SSA may wish to reconsider its persistent reliance on the DOT in disability proceedings. *See* http://www.doleta.gov/programs/onet/ accessed May 28, 2015; *Cunningham v. Astrue*, 360 F. App'x 606, 616 (6th Cir. 2010) ("[T]he Department of Labor replaced the DOT with the Occupational Information Network (O*NET), a database that is continually updated based on data collection efforts that began in 2001."). *See also Horsley v. Comm'r of Soc. Sec.*, No. 11-cv-703, 2013 WL 980315, at *3 (S.D. Ohio Mar. 13, 2013) (making the same observation). The SSA itself has stated (albeit in a notice in the Federal Register more than six years ago) that it "plans…to replace the Dictionary of Occupational Titles." Establishment of the Occupational Information Development Advisory Panel, 73 FR 78864-01 (Dec. 23, 2008).

[3]     www.onetonline.org/crosswalk/DOT/; *see also* www.onetcenter.org/questions/3.html?c=Top (explaining that O*Net includes "crosswalks," which I take to mean "cross references," between the O*Net classification system and the DOT).

17

survives in a different guise. The category associated with the DOT's "Telephone Quotation Clerk" is "Receptionists and Information Clerks." (O*Net No. 43-4171.00) O*Net describes the duties of that job thus: "Answer inquiries and provide information to the general public, customers, visitors, and other interested parties regarding activities conducted at establishment and location of departments, offices, and employees within the organization."[4] Thus, it would seem that the job of Telephone Quotation Clerk has been subsumed by the job of general receptionist. To my mind, however, that is not a close enough fit to permit me to carry over the old DOT category to the O*Net era. Although I do not find such a conclusion implausible, the vocational expert offered no opinion as to whether Feeley could perform the job of a general receptionist, and I will not assume without evidence that he could.

Were this the only job category that the ALJ had found Feeley could perform, a remand might well be appropriate. *See Cunningham v. Astrue*, 360 Fed. App'x 606, 615 (6th Cir. 2010) (remanding to the Commissioner where the two DOT job categories relied on appeared to be obsolete). In the end, however, it does not matter that one of the three job categories appears questionable. I do not have the same reservations as to the other two. And because the vocational expert's testimony indicates that each of those two categories represents a significant number of jobs in the national economy, the ALJ's determination at Step 5 is still supported by substantial evidence.

The other two job categories relied upon by the ALJ do not strike the court as obsolete. Those two categories are Charge Account Clerk and Call Out Operator. (DOT Nos. 205.367-014 and 237.367-046, respectively).

The duties of a Charge Account Clerk are described thus:

> Interviews customers applying for charge accounts: Confers with customer to explain type of charge plans available. Assists customer in filling out application or completes application for customer. Reviews applications received by mail. Files credit applications after credit department approves or disapproves credit. May check references by phone or form letter and notify

---

[4] *See* www.onetonline.org/link/summary/43-4171.00.

customer of acceptance or rejection of credit [CREDIT CLERK (clerical)]. May verify entries and correct errors on charge accounts [CUSTOMER-COMPLAINT CLERK (clerical)], using adding machine. May answer credit rating requests from banks and credit bureaus. May issue temporary shopping slip when credit references appear satisfactory.

DICTIONARY OF OCCUPATIONAL TITLES, § 205.367-014, 1991 WL 671715.

And here are the duties of a Call Out Operator:

Compiles credit information, such as status of credit accounts, personal references, and bank accounts to fulfill subscribers' requests, using telephone. Copies information onto form to update information for credit record on file, or for computer input. Telephones subscriber to relay requested information or submits data obtained for typewritten report to subscriber.

DICTIONARY OF OCCUPATIONAL TITLES, § 237.367-014, 1991 WL 672186.

These job descriptions do not unlock memories of the Reagan era. Nothing about them is inconsistent with the internet age; they seem to involve a level of customer interaction that remains valuable in the current economy. A charge-account clerk, for example, might work in a retail store and decide whether to extend credit to a particular customer for purchases at that particular store. Alternatively, such a clerk might work in customer service for a bank or a credit card company. The job of call out operator seems to include the functions of many an employee of a credit card company.

Though neither party cited O*Net in its briefing, I note that O*Net contains categories that correspond quite closely to the DOT jobs of charge account clerk and call out operator. *See Earls v. Comm'r of Soc. Sec.*, No. 1:09-cv-01465, 2011 WL 3652435, at *7 (N.D. Ohio Aug. 19, 2011) (rejecting an argument that the DOT job categories were outdated where the categories had corresponding entries in O*Net). That these DOT categories survive in the more modern O*Net compilation strongly suggests that they are not obsolete.

The O*Net job corresponding to Charge Account Clerk is "Interviewers" (O*Net No. 43-4111.00) That job is described as: "Interview persons by telephone, mail, in person, or by other means for the purpose of completing

19

forms, applications, or questionnaires. Ask specific questions, record answers, and assist persons with completing form. May sort, classify, and file forms." Thus, both jobs involve interviewing or surveying persons on the telephone and recording the information obtained. Such persons may wish, for example, to apply for something (including, but not limited to, credit).

The O*Net job corresponding to Call Out Operator is "Credit Checker." (O*Net No. 43-4041.02).  That job is described as "Investigate history and credit standing of individuals or business establishments applying for credit. Telephone or write to credit departments of business and service establishments to obtain information about applicant's credit standing."[5] Both the DOT and the O*Net version of this job involve verifying an individual's credit history using the telephone or other methods. DOT says that the individual will "[c]ompile[] credit information, such as status of credit accounts, personal references, and bank accounts." The more modern O*Net description very similarly says that the individual will "[c]ompile and analyze credit information gathered by investigation," and will "[c]ontact former employers and other acquaintances to verify applicant's emplployment, health, history, and social behavior."

Both the DOT categories and the O*Net categories list the jobs as sedentary. Because these latter two DOT job categories do not appear to be anachronistic, I find that the ALJ committed no error in relying on them (or the vocational expert's opinion based on them) to form his conclusions at Step 5.

The vocational expert testified that for a call out operator, there were 60,000 jobs available in the national economy and some 3,400 available in the regional economy. (Hearing Tr., 30) For a charge account clerk, he stated that there were 200,000 jobs available nationally, and 3,400 available regionally. (Hearing Tr., 30). Either of these categories would thus constitute substantial evidence to support the ALJ's conclusion that a significant number of jobs suitable for Feeley exist in the national economy.

---

[5] *See* www.onetonline.org/link/summary/43-4041.02

I note in addition that the corresponding O*Net categories list similarly large numbers of currently available jobs. For call out operator, O*Net indicates that as of 2012, there were 52,000 such jobs in the national economy, and 1,400 in the New Jersey region. For charge account clerk, O*Net lists 205,000 jobs nationally, and 7,670 in the New Jersey region as of 2012.

Even excluding the category of Telephone Quotation Clerk, there was substantial evidence to support the ALJ's conclusion at Step 5 that there are a sufficient number of jobs available in the national economy that Feeley could perform.

## Conclusion

For the reasons stated above, Feeley's appeal will be denied. A separate order will issue.

June 3, 2015
Newark, New Jersey

Kevin McNulty
United States District Judge